## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| LOURDES T. ARCHBOLD-GARRETT | * | CIVIL ACTION NO. 16-15857 |
| WIFE OF/AND DAVID L. GARRETT | * | |
| | * | |
| VS. | * | JUDGE:  Ivan L.R. Lemelle |
| | * | |
| CITY OF NEW ORLEANS AND | * | |
| METRO/DURR GROUP | * | SECTION B /MAG. 3 |
| | * | |

* * * * * * * * * * * * * * * * * * *

## PLAINTIFFS' OPPOSITION TO THE DEFENDANT CITY OF NEW ORLEANS'MOTION TO DISMISS PURSUANT TO RULES 12 (b)(1) and (6)

MAY IT PLEASE THE COURT:

The City of New Orleans seeks to avoid the subject matter jurisdiction of this Court under the Federal Rules of Civil Procedure, Rule 12(b)(1), and its liability for violating the civil rights of plaintiffs whose property was taken without due process of law. Plaintiffs, Lourdes T. Archbold-Garrett, wife of/ and David L. Garrett, submits this memorandum in opposition.

## INTRODUCTION

Contrary to the claims of the city, plaintiff did to resolve this matter with the City, but the attempt was not only ignored, but the City had the audacity to charge plaintiff for the demolition. Undersigned counsel first wrote Norman S. Foster, the City's Chief Financial Officer and Director of the Department of Finance on April 14, 2016.[1]  Instead of responding, the letter was obviously forwarded to the Department of Code Enforcement, which resulted in the City attempting to fabricate some defense to its wrongful demolition of the plaintiffs' property by

---

[1] Letter to Foster, April 14, 2016,attached as Exhibit A.

claiming plaintiffs owed the City the costs of the wrongful demolition.[2]  Undersigned counsel then wrote the Director of Code enforcement on May 4, 2016.[3]  The letter set forth all the relevant facts, plus a chronology of events, and requested information and documents from the City. Plaintiff's claims were ignored and none of the information requested was ever furnished. These and other acts of the City indicate clearly that the City has no intention of paying any compensation to the plaintiff and that any attempts to proceed against the City would be futile. To the contrary, the City is well aware that it acted wrongfully and has actively tried to cover up its wrongdoing. A review of relevant facts shows this to be true.

The events forming the basis of plaintiff's complaint commenced on October 2, 2016, when the property made subject of this litigation was purchased by the plaintiffs from the City.[4] No notice of any defects was ever given to the plaintiffs by the City. On or about January 15, 2016, the plaintiffs' realtor noticed that a sign was placed on the property advising of demolition, despite the fact that photographs and other evidence showed the property was not in danger of collapse. On the same date, January 15, 2016, David Garrett, one of the plaintiffs, advise City representatives of the situation and the City agreed to cancel the demolition and waive the lien it had placed on the property. On January 25, 2016, all liens on the property were cancelled by the City.[5]

---

[2] "IDC Demolition Cost Recovery Letter," April 19, 2016, attached as Exhibit B.

[3] A copy of the letter, including all attachments, is attached as Exhibit C.

[4] A copy of the Act of Sale is attached as Exhibit D.

[5] Copies of the Certificate of Cancellation and Affidavit to Cancel are attached, in globo, as Exhibit E.

On January 29, 2016, the City demolished the property with no notice to the plaintiffs. Upon learning of the demolition, plaintiffs contacted the City and was told that he would be contacted. After hearing nothing further, the plaintiffs retained legal counsel who again attempted to negotiate with the City to no avail.[6]  There was no legitimate reason for such a demolition without notice. The structure posed no danger to life or property since the property was uninhabited. The property could have easily been left alone or stabilized until proper engineering studies could be conducted.  Moreover, the City was fully aware of who the owners were – the City had sold them the property just months before. If there had been any imminent danger, then why did the City change its mind after issuing its demolition order and instead sell the property to the plaintiffs. And why did the City then cancel the prior demolition order and lien?

These facts demonstrate that the City acted wrongfully and has refused to compensate the plaintiff for its acts.  Plaintiff attempted to negotiate with the City only to have its claim ignored by the City and instead charged $11,249.36 for the demolition.[7]  Moreover, as will be shown below, all attempts by the plaintiffs to resolve the matter with the City have been to no avail and any attempts to redress the wrongful demolition procedure are either inadequate or would be futile.

## LAW AND ARGUMENT

In *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), the Court commenced with a general review of ripeness decisions:

---

[6] See Exhibits A, B and C and the related discussion of same in the prior section of this memorandum.

[7] See Exhibit B.

> As the Court has made clear in several recent decisions, a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.[8]

For example, in *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d (1981), the Court rejected a claim that the Surface Mining Control and Reclamation Act of 1977 effected a taking because there was no indication that the appellees had availed themselves of the opportunities provided by the Act to obtain administrative relief by requesting either a variance or a waiver under the act.[9]

Similarly, in *Agins v. Tiburon*, 447 U.S. 255, 263, 100 S.Ct. 2138, 2143, 65 L.Ed.2d 106 (1980), the Court held that a challenge to the application of a zoning ordinance was not ripe because the property owners had not yet submitted a plan for development of their property. 447 U.S., at 260, 100 S.Ct., at 2141. In *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978), the Court declined to find that the application of New York City's Landmarks Preservation Law to Grand Central Terminal effected a taking because the property owners had not sought approval for any alternate plans, and it therefore was not clear whether the Commission would deny approval for all uses that would enable the plaintiffs to derive economic benefit from the property. 438 U.S., at 136–137, 98 S.Ct., at 2665–2666.

The key phrase is that in each case, there was no  final decision regarding the application of the regulation to the property at issue. No such issue exists in the case *sub judice*. The "IDC

---

[8] *Williamson, supra*, at 186.

[9] *Hodel*, *supra*, at 2371.

Demolition Cost Recovery Letter," attached as Exhibit C, states that the demolition proceeded

through the City's Safety and permit Imminent Danger Approval. The regulation in question is

the City's Emergency Procedures ordinance.[10] There was simply no reason for the City to invoke

its powers under the imminent danger provisions of the City's Code of Ordinances.[11]  There was

no opportunity for the plaintiff to seek any administrative relief under the ordinance at issue.

There were no opportunities to apply for variances or waivers or to submit alternate plans. The

City simply demolished the plaintiff's property without any notice whatsoever. The plaintiffs

certainly had an alternate plan – they would have liked the opportunity to repair the structure, but

plaintiffs were never afforded the opportunity to do so. In fact, the City agreed with their plan.

That is why the City cancelled its prior demolition order and decided instead to sell the property

to the plaintiffs. The plaintiffs property was simply destroyed and the City then assessed

plaintiffs $11,249.36 for the costs of the destruction.

The *Williamson County* Court summarized its position as follows:

As in *Hodel, Agins, and Penn Central*, then, respondent has not yet obtained a final
decision regarding how it will be allowed to develop its property. Our reluctance to
examine taking claims until such a final decision has been made is compelled by the very
nature of the inquiry required by the Just Compensation Clause. Although "[t]he question
of what constitutes a 'taking' for purposes of the Fifth Amendment has proved to be a
problem of considerable difficulty," this Court consistently has indicated that among the
factors of particular significance in the inquiry are the economic impact of the challenged
action and the extent to which it interferes with reasonable investment-backed
expectations. Those factors simply cannot be evaluated until the administrative agency

---

[10] New Orleans Code of Ordinances, Division 10, Sec. 26-242.

[11] Division 10. Sec. 26-242 of the Code of Ordinances states that "an imminent danger to
life, health, property or public safety exists whenever there is a substantial likelihood that loss of
life, health, property or public safety will occur prior to fully complying with the notice and
hearing provisions provided in . . .  this Code." No such likelihood existed at the time of the
demolition.

has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question. (citations omitted.)[12]

In this case, contrary to the situation in *Williamson County*, the administrative agency did arrive at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question: the City decided to demolish the plaintiff's property without notice despite having just sold the same property to the plaintiffs and having cancelled the demolition lien on the property..

      This is the crux of this lawsuit. Plaintiff does not contest the validity of the City's ordinance, but only its application in the case *sub judice*. Plaintiffs had just purchased the property from the City with no notice of any defects and the City had cancelled its prior demolition lien. The plaintiffs should have been given notice that the City intended to renege on its cancellation of the prior demolition lien and proceed with demolition in breach of its obligations. Plaintiffs should have been afforded the right to access and assess their property, to determine whether to repair the property and to salvage any valuable building materials in the event the structure was deemed not to be repairable. The actions of the City in determining to demolish the structure without notice or hearing, especially after assuring the plaintiffs that there were no problems with respect to demolition, is the basis of plaintiff's cause of action.

      The actions by the City are particularly egregious since its actions constitute more than simple lack of notice to the plaintiffs. Remember that the City had issued a demolition order on the property. But then the City decided instead to sell the property to the plaintiffs, who intended to renovate and develop the property. The City sold the property to the plaintiffs and cancelled

---

[12] *Williamson County*, *supra*, at 190–91.

the demolition lien, but then demolished the property anyway and now have the audacity to seek recovery of the demolition costs from the plaintiffs.

The second reason given by the *Williamson County* Court that the taking claim was not yet ripe is that the respondent had not sought compensation through the procedures the State has provided for doing so. There are no such procedures in the ordinance at issue. The City's Emergency Procedures ordinance references only the procedures set forth in Chapter 6, Article II, of the Code of the City of New Orleans, but these procedures require that notice of any code violations be given to the owner of the property and an administrative hearing for adjudication of the violation.[13]   The ordinance at issue provides that the City need not comply with these notice and hearing requirements, but only if an imminent danger is determined to exist.[14]   Plaintiff contends no such imminent danger existed when the City destroyed its property. If such a danger existed, then the City would not have cancelled its prior demolition order and lien and sold the property to the plaintiffs. To the extent that the City contends that its imminent-danger determination justified proceeding without notice or process, the plaintiff submits that such a determination was unreasonable.  As such, the City's actions may be excused for procedural due process purposes only if the imminent-danger determination was not an abuse of discretion.[15] Moreover, there are no means under the ordinance to seek compensation for it abuse of discretion and in fact, to add insult to injury, the City has actually charged the plaintiffs for the destruction.

---

[13] New Orleans Code of Ordinances, Chapter 6, Article  II, Sec. 6-36.

[14] New Orleans Code of Ordinances, Division 10, Sec. 26-242 (a).

[15] See *Kinnison v. City of San Antonio*, 480 Fed. Appx. 271, 278 (5th Cir.2012).

The City cites *Rosedale Missionary Baptist Church v. New Orleans City*, 641 F.3d 86, 88 (5th Cir.2011) as analogous, but it is distinguishable. In *Rosedale*, the plaintiff's property was demolished without giving notice to the church, but at the time of demolition, a consent decree was in place which required the city to give notice of the proposed demolition of any structure it determined to be a threat to the "public health, safety, and welfare.[16] The consent decree explicitly stated that it "does not cover or settle any aspects of individual claims for damages associated with past or future wrongful demolition," thus the matter was not ripe because the church had a remedy for the wrongful demolition.  The same does not apply in this case. As stated above, not only does the imminent danger ordinance fail to provide any remedy for wrongful demolition, the city has assessed the plaintiff with the cost of the demolition.

Regarding plaintiff's Fourth Amendment claim, the City admits that a demolition of property constitutes a seizure.[17] Its only argument is that plaintiff's Fourth Amendment claim is unripe because plaintiff  "did not use the inverse condemnation procedures" and thus, the City argues, it is unclear whether plaintiff was uncompensated.

In *First English Evangelical Lutheran Church of Glendale v. Los Angeles Cty., Cal.*, 482 U.S. 304 (1987), the Court explained that while the typical taking occurs when the government acts to condemn property in the exercise of its power of eminent domain, the doctrine of inverse condemnation is predicated on the proposition that a taking may occur without such formal proceedings.[18]  The Court went on to state that consideration of compensation must begin with

---

[16] *Rosedale*, *supra*, at 87.

[17] City's Memorandum in Support, p. 6.

[18] *First English Evangelical, supra, at* 305.

direct reference to the Fifth Amendment, which provides in relevant part that "private property [shall not] be taken for public use, without just compensation." Thus, the Fifth Amendment "does not prohibit the taking of private property, but instead places a condition on the exercise of that power."[19]

In Louisiana, the action for inverse condemnation provides a procedural remedy to a property owner seeking compensation for land already taken or damaged against a governmental or private entity having the powers of eminent domain where no expropriation has commenced.[20]

In the case *sub judice*, however, plaintiff has no action for inverse condemnation since there was no taking of private property for public use. In short, inverse condemnation derives from the Fifth Amendment, which prohibits the taking of private property "for public use, without just compensation." The primary difference is that expropriation is a direct exercise of the power of eminent domain, while inverse condemnation is indirect. Yet both are deemed violations of the Fifth Amendment. In this case, there was no taking of private property for public use. The City simply destroyed plaintiff's property with no pretext of using it for any public purpose. Rather than a taking under the inverse condemnation doctrine, it was an abuse of the City's exercise of its police power.

---

[19] *Id.*, at 314–15, citing *Williamson County*, 473 U.S., at 194, 105 S.Ct., at 3120; *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 297, n. 40, 101 S.Ct. 2352, 2371, n. 40, 69 L.Ed.2d 1 (1981); *Hurley v. Kincaid*, 285 U.S. 95, 104, 52 S.Ct. 267, 269, 76 L.Ed. 637 (1932); *Monongahela Navigation Co. v. United States*, 148 U.S. 312, 336, 13 S.Ct. 622, 630, 37 L.Ed. 463 (1893); *United States v. Jones*, 109 U.S. 513, 518, 3 S.Ct. 346, 349, 27 L.Ed. 1015 (1883).

[20] *State Through Dep't of Transp. & Dev. v. Chambers Inv. Co., Inc.*, 595 So.2d 598, 602 (La.1992).

In addition to the City, plaintiff has also named Metro/Durr Group as a defendant in this matter. In the event this action is dismissed, there is no adequate state court procedure for proceeding against this defendant. As a contractor hired by the City, its liability is dependent upon finding the City liable for its wrongful acts. Plaintiff fears that this defendants could not be joined in any state court proceeding against the City based on inverse condemnation, thus plaintiffs claims against it would be lost if this case is dismissed. Thus any state court proceeding against it are either inadequate or futile.

Finally, it is noted that an exception to ripeness exists when state remedies are inadequate or futile.[21] Such is the situation in the case *sub judice*. Even assuming that a judgment were obtained, there is no way to enforce a civil Judgment against a municipality in the State of Louisiana. It is necessary to have the governing body of the municipality to pass an ordinance approving payment of the Judgment.[22] This, of course, is a completely discretionary decision of the legislative body, so there is no way to require payment of a judgment.

As of June 2015, the City of New Orleans had about six hundred (600) final state court

---

[21] *Wilhelmus v. Par. of St. Bernard*, CIV. A. 09-3644, 2010 WL 1817770, at *2 (E.D. La. May 3, 2010); *Chenier v. Par. of St. Bernard,* CIV.A.09-3373, 2010 WL 2545954, at *2 (E.D. La. June 17, 2010); *Tucker v. Par. of St. Bernard,* CIV.A. 09-8003, 2010 WL 3283093, at *3 (E.D. La. Aug. 17, 2010).

[22] LA. CONST. Art. 12, § 10(c) provides: "The Legislature shall provide a procedure for suits against the state, a state agency, or a political subdivision. It shall provide for the effect of a judgment, but no public property or public funds shall be subject to seizure. No judgment against the state, a state agency, or a political subdivision shall be exigible, payable, or paid except from funds appropriated by the legislature or by the political subdivision against which judgment is rendered." See: "Enforcement of Judgments Against Governmental Entities: The New Sovereign Immunity," 37 LOUISIANA L. REV. 982 (1977).

judgment creditors, who together are owed about $34 million dollars, not including interest, and who remain unpaid. This does not even include the New Orleans firefighters, who have a money judgment for about $75 million dollars in back wages against the City. Being immune from seizure and contempt under state law allows the City to ignore judgment creditors. This neglect is an abuse of right practiced against the neediest of its citizens.

Federal judgments, on the other hand, are not bound by state law restrictions on collection. Federal judgments are paid when final. The result is that any efforts by plaintiff to proceed through state court procedures would be futile since the City would ignore any judgment obtained by the plaintiff, just as it does with other judgments rendered against it. The only way plaintiff can recover the costs of the wrongful demolition is through this federal court proceeding.

**<u>CONCLUSION</u>**

The City of New Orleans wrongfully demolished plaintiff's property with no notice or hearing. Moreover, it did so after expressly assuring plaintiffs that its demolition order and lien was cancelled. It was all accomplished under the pretext of the City's imminent danger ordinance, but the City abused its police power under that ordinance, since there was no imminent danger requiring complete destruction of the property. If there had been any imminent danger, then the City would not have voluntarily changed its mind about demolition, sold the property to the plaintiffs, then cancelled the demolition order and lien. The destruction of plaintiff's property without notice or a hearing constitutes deprivation of plaintiff's rights secured by the Constitution and laws of the United States, under color of law, and entitles plaintiff to damages, attorneys' fees and expert fees pursuant to  42 U.S.C.A. § 1983 and § 1988.

While the ripeness doctrine may require plaintiff to first seek compensation under state law procedures, an exception exists if such a remedy would be inadequate or futile. In this regard, plaintiff attempted to resolve the dispute with the City, only to have its claims ignored by the City and instead charged $11,249.36 for the demolition. Other procedures such as inverse condemnation are inadequate because the plaintiff's property was not taken for public use. In fact, it was not physically taken at all, but rather, was completely destroyed and razed to the ground.

Even if adequate procedures existed, pursuit of them would be futile since the City would simply ignore and refuse to pay any judgment obtained by the plaintiff. Payment of judgments by the City is voluntary and there is no legal method to execute a state court judgment against the City and force it to pay. Only federal court judgments are enforceable.

At the present time, the City has filed a lien against the plaintiff's property for $11,249.36, plus legal interest and costs, for the cost of the wrongful demolition. Unless this action is maintained, the City will no doubt have plaintiff's property seized and sold to satisfy the lien. This lien is particularly offensive due to the fact that immediately following the City's sale of the property to the plaintiffs, the City had voluntarily cancelled its prior demolition lien against the property. Thus, after assuring the plaintiffs that no problems existed with respect to demolition of the property they had purchased, the City demolished the property without any notice and then re-instituted the very lien it agreed to cancel purely as a defense to the plaintiffs' action.

For these reasons, plaintiff urges the Court to deny the City's motion to dismiss.

Respectfully submitted,

*/s/ Regel L. Bisso*
REGEL L. BISSO (#3088) T.A.
ROBERT G. MILLER, JR. (#17061)
BISSO & MILLER, L.L.C.
3925 N. I-10 Service Rd W, Suite 227
Metairie, LA 70002
Telephone: 504-830-3401
Facsimile: 504-883-3157
E-Mail: rbisso@bissomiller.com

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that he has this 21st day of June, 2017, electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to the following: N/A.

He further certifies that he e-mailed a copy of the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participant(s): N/A

/s/ Regel L. Bisso
REGEL L. BISSO